*THERIET v. VOORHIES*

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## H. DEJOL et als. *v.* E. JOHNSON, Administrator.

The legal presumption, that the husband of the mother is the father of all children conceived during the marriage, can only be rebutted in the mode and within the time prescribed by law.

The right to disavow or repudiate a child born under the protection of the legal presumption, is peculiar to the father and can be exercised only by him or his heirs within a given time and in certain cases; and if the father renounces the right expressly or tacitly, it is extinguished and can never more be exercised by any one.

The disavowal by the father must be made in a judicial proceeding, an action to which the child is a necessary party. If the father has never legally contested the legitimacy of a child born in lawful wedlock, mere oral and ex parte declarations of the father, or his wife, or of the child whose claim is contested, touching the legitimacy, cannot be received as evidence.

The penalty of ten per cent. interest upon the funds in hand, for a failure by an administrator to render an annual account, can only be enforced when accompanied by a proceeding to remove the administrator.

APPEAL from the District Court of St. Landry, *Martel*, J.

*T. H. Lewis & Porter*, for plaintiffs and appellants. *J. T. Morrogh*, for defendant.

SPOFFORD, J. *Tapley Déjol* and his wife, *Sarah Johnson*, were free people of color, residing in Louisiana. *Tapley Déjol* died, leaving a small estate, of which one *Neyland* was appointed administrator in the year 1852. *Neyland* having died, the present defendant, *Edmond Johnson*, was appointed administrator of the succession of *Déjol*, which was still unsettled, in the parish of St. Landry.

The present plaintiffs, alleging themselves to be the only legitimate children and heirs of *Tapley Déjol*, on the 8th of August, 1856, filed a petition calling upon the administrator, *Johnson*, to file an account and to pay over the funds of the succession to them, with ten per cent. interest from the date when he was bound to render his annual accounts.

In response to this call, the administrator filed an account and with it a proposed tableau of distribution among the heirs of *Tapley Déjol*, whom he mentions by name as six in number.

The plaintiffs opposed two items only of the account, to wit: the sum of $120, alleged to have been paid *Edward Johnson* for horse-feed, and the item of $612 55 paid *Dr. A. G. Thornton* for a medical bill of the deceased. They specially opposed the distribution suggested by the administrator, upon the ground that three of the alleged heirs, to wit, *Patrick Déjol* (alias *Johnson*), *Murvin Déjol* (alias *Gay*), and *Mathilda Déjol* (alias *Gay*) were not children and heirs of *Tapley Déjol* deceased, but were adulterous bastards born of their mother at a time when she was the lawful wife of *Tapley Déjol*, of an illicit connection with other persons.

Both oppositions were overruled and the account and tableau homologated.

The opponents have appealed.

The item for horse-feed seems to be established by adequate proof.

The large medical bill is not justified by the evidence. There is no detailed account of items. Two or three visits to the parish of Calcasieu, about forty miles from *Dr. Thornton's* residence in Flat Town, and constant attention to the deceased for a fortnight in his own house, whither *Déjol* was removed before his death, together with the furnishing of medecines, are all the services specifically proved. It is true a witness states that the doctor attended the deceased for six or eight months before his death. The disease was also a loathsome one. But the opinion of this witness, that the bill was a just and correct one, cannot supply the lack of data to support such an opinion. Upon a survey of the evidence we are satisfied that $300 would be a liberal allowance for the services as proven, and the item charged as paid to *Dr. Thornton* must be reduced to that sum.

The appellant's counsel states, in his written argument of the cause, that he pleads the prescription of one and three years to these two items. But as we find no such plea filed in the Record, we cannot consider it. A brief of counsel forms no part of the pleadings in a cause.

On the opposition to the proposed distribution, the judgment was clearly correct. The appellants offered witnesses to traduce the character of their own mother by showing that she abandoned her husband, their father, and lived so remote from him when she conceived the children whose claims they oppose, that cohabitation with him was physically impossible; they also offered to show that these children were adulterous bastards alleged to be such by their father and openly acknowledged to be such by their mother; all of which evidence was rejected by the court, on the ground that the father had never legally contested the legitimacy of these children, as required by the Article 210 of the Civil Code, and that the delay for doing so had expired before his death, so that his heirs were by the Article 211 debarred from raising the controversy now.

The appellant excepted to the ruling of the court, and now contends that the cause should be remanded for the reception of this parol evidence. The Article

203 of the Code embodies the maxim *pater est quem nuptiæ demonstrant;* "the law considers the husband of the mother as the father of all children conceived during the marriage." The legal presumption can only be rebutted in the mode and within the time prescribed by law. "The right to disavow and repudiate a child born under the protection of the legal presumption is peculiar to the father and can be exercised only by him, or his heirs, within a given time, and in certain cases. If the father renounces the right expressly or tacitly, it is extinguished and can never more be exercised by any one.\*\*\* The right to disavow (*action en désaveu*) is entirely distinct and different from that which all parties, whose interest may be affected, have to contest the legitimacy of one in whose favor the legal presumption does not exist (*contestation de légitimité*)." *Eloi* v. *Mader*, 1 Rob., 584.

"In all the cases above enumerated, where the presumption of paternity ceases, the father, if he intends to dispute the legitimacy of the child (*s'il veut réclamer contre la légitimité*) must do it within one month, if he be in the place where the child is born, or within two months after his return, if he be absent at that time, or within two months after the discovery of the fraud, if the birth of the child was concealed from him, or he shall be barred from making any objection to the legitimacy of such child (*et à défaut de faire la réclamation dans ces délais, le père y sera déclaré non recevable*). C. C., 210.

"If the husband die without having made such objection (*avant d'avoir fait sa réclamation*), but before the expiration of the time directed by law, two months shall be granted to his heirs to contest the legitimacy of the child, to be counted from the time when the said child has taken possession of the estate of the husband, or when the heirs shall have been disturbed by the child in their possession thereof." C. C., 211.

It was held in *Tate* v. *Penne*, 7 N. S., 553, to be a perfectly well established principle, that "a child born during marriage cannot have its condition affected by the declaration of one or both of the spouses."

And in the case of *Vernon* v. *Vernon's Heirs*, 6 An., 245, where the Banbury Peerage case was held to be the rule as to the condition of the plaintiff, which was fixed by the law in force in South Carolina, it was remarked by the court that, under our laws (Code, 209, 210, 211), the defendants would not be permitted to question the legitimacy of the plaintiff, although he was never acknowledged by the husband of his mother to be a legitimate son. See also 2 Toullier, Nos. 831 et seq. 858 et seq. The reason was that he had not contested the legitimacy of this son in the manner and time pointed out by the Code. Our Article 210 is taken substantially, and Article 211 literally, from the Napoleon Code—Articles 316 and 317. It has uniformly been considered that the mode of disavowal prescribed by the latter Articles of the French Code, was, by a judicial proceeding or action to which the child was a necessary party either in person or by the intervention of a tutor *ad hoc* appointed by a family meeting. *Le désaveu doit être formé devant les tribunaux civils, dans les formes ordinaires,*" 2 Toullier, No. 842. "*Le désaveu est une action qui tend à dépouiller un enfant de la qualité de fils ou fille légitime, que lui donnait injustement la présomption légale. Cette action appartient au mari; elle appartient aussi à ses héritiers, mais seulement dans deux cas déterminés,*" 317, 425. *Rogron C. N.* 312. "*Le désaveu est l'*ACTION *par laquelle on prétend qu'un enfant, conçu ou tout au moins né dans le mariage, n'est pas le fils du mari de sa mère; c'est tout simplement la dénégation* JUDICIAIRE *de la pater-*

*nité du mari. La contestation de légitimité est l'action par laquelle on prétend qu'un enfant n'est pas légitime, pour une cause quelconque.*" 2 Marcadé, No. 16.

There is no reason to suppose that the framers of our Code intended that the disavowal should be made in any mode less solemn, public and imperishable than a judicial proceeding. The terms of the Articles 210 and 211 quoted above indicate a legal contestation; "if he intends to dispute the legitimacy (*s'il veut réclamer contre la légitimité*), or "to contest the legitimacy," are phrases which mean something more than a mere oral and *ex parte* declaration. The Article 318 of the Napoleon Code is omitted in our Code. "Tout acte extra-judiciaire contenant le désaveu de la part du mari ou de ses héritiers, sera comme non-avenu s'il n'est pas suivi, dans le délai d'un mois, d'une action en justice, dirigée contre un tuteur *ad hoc* donné à l'enfant, et en présence de sa mère."

But the last clause of Article 210, "or he shall be barred from making any objection to the legitimacy of such child" (*et à défaut de faire la réclamation dans ces délais, le père y sera déclaré non recevable*), has been added to the corresponding Article of the Napoleon Code (Art. 316) by which it is apparent that the extension of one month for bringing the action, which might be gained under the latter Code by an extra-judicial disavowal of the child, was not intended to be retained in Louisiana.

There was therefore no error in refusing to hear parol evidence of the declarations of *Déjol* or his wife, or of the children whose claims are contested, touching their legitimacy.

As to the prayer for ten per cent. interest upon the funds in hand for a failure to render an annual account, it suffices to remark that this is not a proceeding to remove the administrator, and that the former penalty has been held to be an accompaniment of the latter under the statute of 1837 reënacted in 1855. Rev. Stat., p. 3, sec. 4; *Thomas* v. *Bougeat*, 1 *Rob.*, 406; *Succession of Desorme*, 10 Rob., 480.

It is, therefore, ordered, that the judgment appealed from, so far as it overrules the opposition to the item of $612 55, charged as having been paid by the administrator to *Dr. A. G. Thornton* for medical services, be avoided and reversed; and it is further ordered, that the sum allowed for said item be reduced to $300; it is also ordered and decreed, that as thus reduced and amended, the judgment homologating the said account be affirmed; and it is further ordered, that the judgment homologating the tableau of distribution be so amended as to fix the sum to be equally distributed among the heirs named in the tableau at five thousand two hundred and sixty-six dollars and 42 cents ($5,266 42), or eight hundred and seventy-seven dollars and seventy-three cents and two-thirds each; and it is further ordered, that the judgment homologating the administrator's tableau of distribution, as thus amended, be affirmed; the costs of the opposition in both courts to be borne by the appellee.